IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

MICHAEL WILLIAM GRENNIER-MARS,
Plaintiff,

v.

MISSION 94 FIREARMS EDUCATION CENTER,
TAWANI ENTERPRISES, INC.,
SCOT LOESCH, General Manager, individually,
CHRIS METER, Operations Manager, individually,
JENNIFER NIENHAUS, Training Manager, individually,
Defendants.

Case No: _____

U.S. DISTRICT COURT
EASTERN DISTRICT - WI
FILED

2026 JUL -6 A 11: 31

CLERK OF COURT

**26-C 1176**

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1. Plaintiff Michael William Grennier-Mars is a resident of Bristol, Wisconsin, and was employed by Mission 94 Firearms Education Center as a Lead Armorer.

2. Defendant Mission 94 Firearms Education Center is an indoor firearms range and training facility located in the Eastern District of Wisconsin.

3. Defendant Tawani Enterprises, Inc. is the parent corporation of Mission 94 and shares responsibility for corporate management and human resources policies.

4. Defendant Scot Loesch is the General Manager of Mission 94, named in both his professional and individual capacities.

5. Defendant Chris Meter is the Operations Manager of Mission 94. Defendant Meter is a resident of the State of Illinois and concurrently serves as a Board Member of the Police Commission and Trustee of the Police Pension Board for the City of Highwood, Illinois. Defendant Meter is named in both his professional and individual capacities.

6. Defendant Jennifer Nienhaus is the Training Supervisor at Mission 94, named in both her professional and individual capacities.

## FACTUAL BACKGROUND

### Fraudulent Inducement of Employment Roles and Adverse Actions

7. During Plaintiff's initial interview, Defendant explicitly stated it would train and ensure all employees were fully cross-trained across all operational divisions.

8. These divisions included CCW trainer, firearms trainer, customer service representative, range safety officer, and gunsmithing/armorer services. Plaintiff fit all the criteria Defendant was seeking at the time, possessing five years of professional experience in each area.

9. Plaintiff believed these representations to be true because, two weeks prior to his official start date, he received an email directing him to assist in training the acting training manager via Microsoft Teams—a two-and-a-half-hour session explicitly regarding Wisconsin concealed carry laws and class initiation.

10. Upon Plaintiff's start date, management explicitly assured him that he would be teaching classes, stating that "it will just take some time" to implement.

11. Initially, Defendant assigned Plaintiff to conduct one-on-one firearm instruction, duties Plaintiff performed while operating under management's promise that CCW instruction duties would soon follow.

12. Furthermore, management explicitly assigned Plaintiff the responsibility of conducting party firearms safety briefs and general range safety briefs, directly telling Plaintiff these specific briefing duties "were mine when I was available."

13. In September 2025, Plaintiff approached Range Operations Manager Chris Meter regarding his expiring credentials, noting he had not been assigned any students necessary to maintain his active certifications.

14. In response, Meter explicitly informed Plaintiff that he "will not be teaching any classes." When asked for a reason, Meter simply stated, "You just aren't going to be."

15. Concurrently, Defendant abruptly and entirely without explanation stripped Plaintiff of his one-on-one firearms training duties, as well as his assigned party firearm safety and range safety briefing responsibilities.

16. Plaintiff was provided no operational justification for the sudden removal of these duties at the time, though the retaliatory and discriminatory motive subsequently became apparent.

### Wage Theft and Fair Labor Standards Act (FLSA) Violations

17. On September 3, 2024, Defendant extended a formal written offer of employment to Plaintiff for the position of Armorer with a salary of $52,000 per year.

18. This offer, confirmed by Recruiter Candice Friend, served as the binding financial agreement for the role.

19. While the written offer specifically listed the title of "Armorer," Plaintiff relied on Defendant's verbal guarantees, interview representations, and pre-employment tasking that the role would encompass fully cross-trained instructional duties as a material condition of accepting the $52,000 salary.

20. Despite the $52,000 agreement for a standard 40-hour workweek, Defendant consistently and deliberately scheduled Plaintiff for only 37.5 hours per week.

21. When Plaintiff questioned Operations Manager Scott Loesch about this deliberate shortage, Loesch explicitly admitted the schedule was designed this way so that "just in case you get a little overtime here and there it kind of compensates for the half an hour every day that you're kind of missing."

22. Management subsequently instructed Plaintiff that he could arrive a half-hour early or stay a half-hour late to make up for this daily deficit.

23. Concurrently, Defendant mandated a 30-minute unpaid lunch break. However, due to chronic understaffing and operational requirements on the floor, Plaintiff rarely received this break, resulting in systemic, uncompensated labor.

24. Management unilaterally revoked the promised paid holidays. Following staff complaints to Human Resources, management implemented three "floating holidays" as a substitute.

25. When Plaintiff attempted to utilize these floating holidays and mental health days, management employed a schedule manipulation tactic: granting the day off while simultaneously removing a different scheduled shift that week, ensuring Plaintiff was never paid for the earned holiday time.

26. Around the New Year, Plaintiff explicitly reported the ongoing wage shortages, uncompensated lunch breaks, and schedule manipulations to Chief Human Resources Officer (CHRO) Nicole Pettis and Human Resources representative Kim Carr.

27. Despite receiving direct notice of these FLSA violations, neither Pettis nor Carr took immediate corrective action, allowing the illegal practices and wage theft to continue unabated for months.

28. On June 10, 2026, CHRO Nicole Pettis issued a corporate-wide directive acknowledging the systemic failures, explicitly mandating that employees "must record their actual clock-in and clock-out times" and insisting that 30-minute meal breaks "are mandatory and cannot be skipped."

29. This June 10, 2026, directive serves as a clear corporate admission that the facility's prior timekeeping and break practices—which Plaintiff had actively reported months prior—were systematically non-compliant, proving the wage violations were willful.

Protected Activity, Retaliatory Animus, and Witness Intimidation

30. In January 2025, a coworker of Plaintiff reported severe safety concerns to Range Operations Manager Chris Meter regarding fatigued training staff. Meter ignored these warnings, which subsequently resulted in a preventable negligent discharge (ND) by a student on the range.

31. When the coworker reported the incident to Defendant's leadership, Meter immediately retaliated by stripping the coworker of his range control duties and subjecting him to targeted workplace harassment.

32. Plaintiff engaged in protected activity by directly confronting Meter about this retaliatory harassment. In response, Meter explicitly admitted his illegal retaliatory motive to Plaintiff, stating regarding the coworker: "F*** that guy, he turned me into HR, he can go f*** himself."

33. In May 2025, Plaintiff escalated his protected activity by making a direct, verbal report to Human Resources regarding the ongoing retaliatory and harassing conduct committed by Meter and Training Supervisor Jennifer Nienhaus.

34. Plaintiff explicitly asserted that management was violating its own anti-harassment policies, but Human Resources dismissively minimized the verbal report as a mere "personality conflict" and took no corrective action.

35. Shortly thereafter, the harassed coworker resigned and filed a formal complaint with the Department of Workforce Development (DWD), specifically naming Plaintiff as a corroborating witness to management's retaliation.

36. In direct response to the DWD complaint and Plaintiff's status as a named witness, including other staff members, Defendant's management initiated a campaign of witness intimidation, isolating employees individually, falsely asserting they were bound by Non-Disclosure Agreements (NDAs), and threatening them with financial ruin and lawsuits if they discussed company business with anyone outside the facility.

Pretextual Discipline and Manufactured Infractions

37. Shortly after the DWD complaint was filed, Plaintiff was eating lunch in the employee breakroom with several coworkers, including Dana Swatek, Chris Wozny, Jennifer Nienhaus, Richard Gordon and a Black male colleague, Jordan Gray.

38. An unidentified individual falsely reported the group to Human Resources representative Kim Carr, accusing them of "speaking racially," despite no racial or inappropriate conversation having occurred.

39. During the ensuing investigation, every employee present in the room, specifically including Jordan Gray, explicitly denied to Human Resources that anything racial was said.

40. In a blatant attempt to manufacture a disciplinary infraction, Defendant's management aggressively attempted to coerce Mr. Gray into falsely stating he was offended by the conversation, which he steadfastly refused to do.

41. Despite the unanimous denial of all witnesses and the explicit refusal of the supposed victim to claim offense, Defendant issued formal written discipline to Plaintiff, Ms. Swatek, Mr. Wozny, and Ms. Nienhaus, forcing them to write apology letters under threat of termination.

42. Demonstrating the arbitrary and discriminatory nature of this discipline, management intentionally exempted one employee in the room, Richard Gordon, from any punishment solely due to his personal friendship with the facility's owner.

43. Defendant weaponized this fabricated incident to build a pretextual disciplinary file against Plaintiff and Ms. Swatek, directly retaliating against them for their protected status as named witnesses in the pending DWD complaint.

Systemic Retaliation, Witness Elimination, and Coercion

44. Following the manufactured lunchroom incident, Defendant escalated its retaliatory campaign against the employees named as corroborating witnesses in the pending DWD complaint.

45. During this period, both Mr. Richmond and Ms. Swatek repeatedly confided in Plaintiff, expressing their direct fear that management was actively padding their personnel files with fabricated infractions in a deliberate effort to terminate them.

46. Ultimately, Mr. Richmond was forced out of the company. Immediately following his departure, General Manager Scott Loesch pulled Plaintiff into the office and again threatened him with an NDA, using the threat of financial ruin to intimidate Plaintiff into silence.

47. Months later, Defendant terminated Ms. Swatek. Upon information and belief, and based on accounts directly reported to Plaintiff by Ms. Swatek and other floor staff, Defendant utilized a false pretext of "theft" regarding an item discount that GM Loesch had previously authorized but maliciously retracted.

48. Plaintiff was further informed by these sources that during the termination meeting, Loesch and Meter subjected Ms. Swatek to extreme coercion, threatening her with criminal charges if she refused to sign termination paperwork, attempted to claim unemployment benefits, or spoke to anyone about the incident.

49. Coworkers also reported to Plaintiff that following the meeting, Loesch humiliatingly paraded Ms. Swatek through the facility as she gathered her belongings, intentionally displaying her to the remaining staff in a manner designed to incite fear.

50. Through these retaliatory actions, the pool of DWD corroborating witnesses was systematically reduced to only two remaining employees, including Plaintiff.

51. In the direct aftermath of Ms. Swatek's termination, GM Loesch pulled Plaintiff into the office yet again to reiterate the NDA threats, explicitly attempting to intimidate and silence Plaintiff as one of the last remaining witnesses to the company's retaliatory purge.

Adverse Employment Actions and Supervisory Harassment

52. Concurrent with the systematic elimination of DWD witnesses and the repeated NDA threats from GM Loesch, Defendant subjected Plaintiff to further retaliatory adverse employment actions by progressively stripping him of his remaining instructional duties.

53. Specifically, management abruptly revoked Plaintiff's authorization to conduct party safety briefs and one-on-one firearms lessons—responsibilities he had successfully managed—and intentionally began training other employees to assume those exact roles.

54. Highlighting the retaliatory animus behind this targeted reduction in duties, Training Supervisor Jennifer Nienhaus approached Plaintiff and stated in a highly demeaning and condescending manner, "Don't worry Mike, you will get your turn for the training."

55. Furthermore, coworkers directly informed Plaintiff that Ms. Nienhaus was actively defaming his character and disparaging his professional abilities to other floor staff, deliberately attempting to undermine his reputation, damage his standing as a Lead Armorer, and further isolate him within the hostile workplace.

Improper Administrative Processing and Retaliatory Actions

56. In late 2024, Plaintiff raised internal compliance concerns regarding management's new administrative procedures for processing the return of personal property. Management summarily dismissed these concerns and directed Plaintiff not to question the policy.

57. Over a year later, in December 2025, Plaintiff sought to retrieve his own personal property from the facility.

58. Despite Plaintiff's prior compliance warnings, management deliberately misprocessed Plaintiff's property return, intentionally utilizing an improper administrative classification.

59. Management's intentional misclassification artificially triggered the generation of an inaccurate administrative report regarding Plaintiff.

60. Defendant subsequently transmitted this inaccurate report to outside entities.

61. By knowingly transmitting false administrative data, Defendant maliciously cast Plaintiff in a false light and generated an unwarranted flag on his professional record, directly jeopardizing his industry standing.

62. Defendant selectively weaponized this improper administrative procedure exclusively against Plaintiff as a direct act of retaliation.

Protected Whistleblowing, Breach of Confidentiality, and Escalated Retaliation

63. On January 7, 2026, Plaintiff engaged in protected activity by submitting a confidential written report directly to Tawani Enterprises General Counsel Michelle Nakfoor regarding systemic retaliation and ongoing compliance failures.

64. Plaintiff's report specifically alleged that GM Loesch and Operations Manager Meter were threatening employees with "financial ruin" and "criminal charges" to deter cooperation with

state DWD investigators, and also reported improper human resources practices overseen by COO Kim Carr.

65. Plaintiff subsequently provided written clarification to corporate HR detailing how management utilized mandatory, closed-door sessions to isolate and intimidate witnesses immediately following the terminations of coworkers Jacob Richmond and Dana Swatek.

66. Defendant declined to properly investigate Plaintiff's allegations. Instead, CHRO Nicole Pettis abruptly canceled a scheduled meeting with Plaintiff, stating via email, "We have what we need at this time."

67. Defendant's corporate leadership then disclosed Plaintiff's confidential report directly to Carr, Loesch, and Meter—the specific subjects of the whistleblower complaint.

68. Immediately following this disclosure, Meter escalated retaliatory actions against Plaintiff, subjecting him to a hostile work environment characterized by severe verbal abuse, deliberate isolation, and public disparagement.

69. As part of this retaliatory campaign, Defendant issued Plaintiff a pretextual disciplinary write-up for using profanity to describe a faulty customer firearm. This discipline constituted disparate treatment; another employee, Chris Wozny, used identical language without facing any disciplinary action.

70. Demonstrating retaliatory motive, GM Loesch issued the write-up while gesturing to Meter and stating to Plaintiff, "We have to document everything now, don't we?"

71. Furthermore, following Plaintiff's January 7 report to General Counsel Nakfoor, local management abruptly ceased their use of NDA threats, demonstrating corporate awareness that the prior intimidation tactics were unlawful.

Good Faith Compliance Reporting and Escalated Retaliation

72. On April 23, 2026, acting in his professional capacity as Lead Armorer, Plaintiff drafted and submitted a good-faith internal document detailing operational non-compliance.

73. In this document, Plaintiff outlined specific procedural failures and explicitly warned management of the potential risks and regulatory liabilities these practices posed to the facility, the staff, and the corporation.

74. Shortly after the submission of this compliance document, local management recognized Plaintiff's protected whistleblowing activity and immediately initiated a severe, unprecedented wave of retaliation against him.

75. This retaliatory campaign escalated significantly on or around May 2, 2026, creating a profoundly hostile and intolerable work environment.

Formal Notice of Liability and Prohibited Conduct

76. On or around April 7, 2026, Defendant conducted a mandatory training session for management and staff focused on workplace culture and professional conduct.

77. Attendees at this session included Operations Manager Chris Meter, General Manager Scott Loesch, and CHRO Nicole Pettis.

78. During this session, the facilitators explicitly warned management and staff regarding the legal prohibitions against workplace retaliation and derogatory behavior.

79. Management was further advised during this session that both the corporation and individual managers could be held personally liable for such conduct.

80. Notwithstanding this formal guidance and the warnings delivered, Defendant's management—including Chris Meter and Scott Loesch—continued to engage in the very retaliatory conduct they had been cautioned against.

81. By disregarding these explicit warnings, failing to intervene, and maintaining the retaliatory campaign, Defendant—through Meter, Loesch, and CHRO Nicole Pettis—demonstrated a willful and malicious disregard for their legal obligations.

Failure to Maintain Engineering Controls and Safety Baselines

82. Defendant did not conduct mandatory initial OSHA baseline testing for airborne lead levels.

83. Defendant did not implement a mandatory noise monitoring program using time-weighted average dosimeters.

84. Defendant scheduled Range Safety Officers (RSOs) for unrotated shifts in the indoor range environment without establishing this baseline exposure data.

85. The facility's primary engineering control for spent brass collection, an Ammo-Up HD1000 Brass Collector, remained inoperable from October 2025 through May 2026.

86. While the unit was inoperable, management directed staff to use standard shovels and buckets to manually collect spent brass.

87. This manual collection method caused the resuspension of settled lead dust and heavy metal debris into the staff's breathing zones.

May 1–3, 2026: Protected Regulatory Reporting, Bypassed Protocols, and Retaliatory Endangerment

88. Prior to May 1, 2026, Plaintiff engaged in protected activity by reporting severe regulatory violations directly to corporate leadership.

89. In response to Plaintiff's protected report, corporate leadership intervened and contacted local management on May 1, 2026, regarding compliance and facility operations.

90. Upon learning of Plaintiff's escalation to corporate, General Manager Scott Loesch and Operations Manager Chris Meter became overtly enraged and immediately initiated a punitive, retaliatory campaign against Plaintiff.

91. Later that same day, May 1, 2026, as a direct act of retaliation, General Manager Scott Loesch directed floor staff to place 20 uninspected used firearms onto the retail shelf for public sale.

92. By doing so, Loesch deliberately bypassed the facility's standard operating procedure (SOP), which required the Lead Armorer (Plaintiff) to inspect all used firearms prior to sale.

93. On May 2, 2026, Operations Manager Chris Meter suspended the 2-hour NSSF/OSHA rotation SOP, forcing two RSOs to endure near-continuous 8-hour shifts on the live range.

94. At the time of this directive, there were five certified RSOs present in the facility, demonstrating that the extended line exposure was not an operational necessity but a deliberately manufactured hazard.

95. Meter directed Plaintiff, a certified RSO, to remain at the desk for the duration of the May 2 shift, explicitly stating, "You're staying at the desk all day and you better not move."

96. This forced desk confinement was an act of pure retaliation for Plaintiff's protected reports to corporate leadership regarding the regulatory violations. By neutralizing Plaintiff's ability to provide relief rotations, Defendant intentionally punished Plaintiff by forcing him to helplessly watch his coworkers suffer in an untested, hazardous environment.

97. The availability of five RSOs, the forced isolation of Plaintiff, and the resulting deliberate endangerment of the floor staff are fully verifiable via the facility's May 2nd security camera footage.

98. Meter subsequently left the facility at 4:00 PM on May 2 while staff remained on the live firing line.

99. On May 3, 2026, Meter was absent from the facility, leaving only Plaintiff and one other RSO to cover a 6-hour period.

100. Due to this staffing shortage, Plaintiff and the other RSO were required to work 3-hour continuous line shifts without rotation.

May 4, 2026: Internal Reporting and Subsequent Actions

101. On May 4, 2026, Plaintiff submitted a formal document titled "3rd compliance notice" via email to corporate leadership, including General Counsel Michelle Nakfoor and CHRO Nicole Pettis.

102. The written notice formally documented the bypassed firearm inspections, the lack of OSHA baseline testing, the inoperable engineering controls, and the retaliatory staffing events of May 1-3.

103. On May 4, 2026, CHRO Nicole Pettis replied to Plaintiff's report by questioning how Plaintiff learned of the May 1 corporate phone call, rather than addressing the reported safety and compliance issues.

104. Following the submission of the May 4 report, Defendant removed Plaintiff's remaining Range and GSSF duties.

105. Management subsequently directed floor staff to isolate Plaintiff, resulting in staff refusing to communicate with him and actively attempting to find pretexts for disciplinary action.

Corporate Ratification and Chilling of Protected Activity (May 26, 2026)

106. Following Plaintiff's formal OSHA complaint and the subsequent on-site OSHA inspection, Defendant's corporate leadership issued a facility-wide electronic communication on May 26, 2026.

107. This communication was authored by CHRO Nicole Pettis and Mary Falcon and distributed to all Mission 94 staff.

108. Rather than assuring staff of a neutral, protective investigation into the reported hazards, corporate leadership utilized this email to explicitly endorse the continued authority of General Manager Scott Loesch and Operations Manager Chris Meter—the specific individuals named in Plaintiff's severe safety and retaliation reports.

109. The corporate communication mandated that staff "work cooperatively with Scot and Chris" and explicitly stated, "We fully support Scot and Chris' leadership as they work through this process."

110. By issuing this directive, Defendant's corporate leadership deliberately signaled to the staff that the retaliatory managers were protected by the highest levels of the organization.

111. This communication effectively chilled any further protected whistleblowing by remaining employees, as it demonstrated that cooperating with OSHA or internal investigations would pit them directly against corporate-backed management.

112. Through this May 26, 2026, communication, Defendant formally and in writing ratified the illegal and retaliatory actions committed by local management, assuming full corporate liability for their conduct.

CAUSES OF ACTION

Count I: Willful Violations of the Fair Labor Standards Act (FLSA)

(Unpaid Wages, Meal Break Violations, and Schedule Manipulation)

113. Plaintiff incorporates the previous paragraphs as if fully set forth herein.

114. Defendant was an employer covered by the FLSA during Plaintiff's employment.

115. Defendant willfully violated the FLSA by routinely denying Plaintiff mandatory, uncompensated 30-minute meal breaks while requiring Plaintiff to perform continuous labor.

116. Defendant further engaged in illegal schedule manipulation to intentionally short Plaintiff's weekly hours and deprive Plaintiff of earned, compensated holiday time.

117. Defendant's June 10, 2026, corporate directive explicitly acknowledges these systemic timekeeping and break failures, proving the wage violations were willful.

118. As a direct result of these willful violations, Plaintiff has suffered lost wages and is entitled to back pay, liquidated damages, and allowable costs under the FLSA.

Count II: Workplace Retaliation and Whistleblower Reprisal

(Retaliation for Protected OSHA, Regulatory, and Compliance Escalations)

119. Plaintiff incorporates the previous paragraphs as if fully set forth herein.

120. Plaintiff engaged in legally protected activities, including acting as a named corroborating witness in a Department of Workforce Development (DWD) investigation, filing a formal complaint with the Occupational Safety and Health Administration (OSHA), and reporting severe regulatory and safety violations directly to corporate leadership.

121. Defendant had direct knowledge of Plaintiff's protected activities.

122. In direct response to these protected activities, Defendant subjected Plaintiff to a campaign of severe and pervasive adverse employment actions, including the revocation of professional duties, pretextual disciplinary action, forced desk confinement, and deliberate exposure to unmitigated physical hazards on the live range.

123. Defendant formally ratified this retaliatory conduct via the corporate communication issued on May 26, 2026.

124. A clear causal connection exists between Plaintiff's protected whistleblowing and Defendant's retaliatory conduct.

125. As a direct result of Defendant's retaliation, Plaintiff has suffered significant professional, financial, and emotional harm.

Count III: Fraudulent Inducement of Employment

(Bait-and-Switch Hiring Practices)

126. Plaintiff incorporates the previous paragraphs as if fully set forth herein.

127. Defendant made material, false representations to Plaintiff regarding the scope of his duties, explicitly promising full cross-training and instructional roles to induce Plaintiff into accepting a $52,000 salaried position.

128. Defendant knew or should have known these representations were false at the time they were made, as evidenced by their arbitrary revocation of these duties and management's explicit admission that Plaintiff would "not be teaching any classes."

129. Plaintiff justifiably relied on Defendant's verbal and written promises when accepting the employment offer.

130. As a direct result of Defendant's fraudulent inducement, Plaintiff suffered financial and professional damages.

Count IV: Defamation and False Light
(Improper Administrative Processing and Malicious Reporting)

131. Plaintiff incorporates the previous paragraphs as if fully set forth herein.

132. Defendant deliberately misclassified the administrative return of Plaintiff's personal property to generate a false and inaccurate administrative report.

133. Defendant knowingly transmitted this false information to outside entities with the intent to damage Plaintiff's professional reputation.

134. Defendant's actions were taken maliciously and with reckless disregard for the truth, placing Plaintiff in a false light within his highly regulated industry.

135. As a direct result of this transmission, Plaintiff's professional standing and industry record were unlawfully harmed.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michael Grennier respectfully requests that this Honorable Court enter judgment against Defendant and award the following relief:

A. Injunctive and Equitable Relief:

136. Issue a permanent injunction prohibiting Defendant, its officers, management, and agents from engaging in any further retaliation, harassment, or creation of a hostile work environment against Plaintiff.

137. Issue an order prohibiting Defendant from terminating, demoting, or otherwise taking adverse employment action against Plaintiff as a result of filing this lawsuit.

138. Mandate Defendant's immediate and verified compliance with all Occupational Safety and Health Administration (OSHA) regulations, including the implementation of mandatory baseline testing and the repair of required engineering controls.

139. Issue an order requiring Defendant to correct and expunge the false administrative records improperly transmitted to outside entities regarding Plaintiff's professional standing.

B. Economic and Wage Damages:

140. Award Plaintiff unpaid wages, including compensation for all chronically denied and uncompensated 30-minute meal breaks, pursuant to the Fair Labor Standards Act (FLSA).

141. Award Plaintiff compensation for all earned but uncompensated holiday and/or paid time off resulting from Defendant's schedule manipulation.

142. Award Plaintiff liquidated damages in an amount equal to the unpaid wages, as provided by the FLSA for willful violations.

C. Compensatory Damages:

143. Award Plaintiff compensatory damages in an amount to be determined at trial for the severe emotional distress, psychological harm, and physical endangerment inflicted by Defendant's intentional and retaliatory actions.

144. Award Plaintiff compensatory damages for the reputational harm and damage to his professional standing in his industry resulting from Defendant's defamation and false light transmission.

D. Punitive Damages:

145. Award Plaintiff punitive damages in an amount sufficient to punish Defendant for its willful, malicious, and legally reckless conduct, and to effectively deter Defendant and its corporate leadership from engaging in similar unlawful actions in the future.

E. Legal Fees and Costs:

146. Award Plaintiff reasonable costs and expenses incurred in bringing this action, including all applicable pro se litigation costs, pursuant to the FLSA and other applicable federal and state statutes.

F. Further Relief:

147. Award such other and further relief as this Court deems just, equitable, and proper.

JURY DEMAND

Plaintiff demands a trial by jury on all issues and counts so triable.

Respectfully submitted,

Date: 7-6-2026

Signature: _____

Michael William Grennier-Mars

(Pro Se Plaintiff)

[Address Redacted - Filed Under Seal]

Email: mikegrenn@gmail.com

Phone Number: 414-755-9191